## M.M. *vs.* D.A.

Nos. 09-P-2247, 10-P-757, & 10-P-758.

Bristol. October 14, 2010. - April 4, 2011.

Present: COHEN, BROWN, & KATZMANN, JJ.

*Probate Court,* Custody of child. *Minor,* Custody. *Parent and Child,* Custody. *Contempt. Practice, Civil,* Contempt, Waiver, Service of process, Relief from judgment. *Waiver.*

In an appeal from a contempt judgment of the Probate and Family Court, as amended and supplemented, and from an order of the court denying the father's motion for relief from the judgment on which the contempt was brought, the father failed to demonstrate, on the limited record before this court, that the probate judge committed clear error in determining that the father did not timely raise, and thus waived, the question of insufficient service of process of the underlying complaint for support and custody, and in finding that the father had actual notice both of the temporary order and the fact that a judgment had entered in the matter [204-206, 208-209]; further, the father was unable to demonstrate, on the limited record, his inability to comply with the court's orders [206-208].

COMPLAINT for support and custody filed in the Bristol Division of the Probate and Family Court Department on September 21, 2006.

A complaint for contempt, filed on April 6, 2009, was heard by *Anthony R. Nesi,* J., and entry of a supplemental judgment, dated January 19, 2010, was ordered by him; and a motion for relief from judgment was considered by *Elizabeth O'Neill LaStaiti,* J.

*Kimberly Moses Smith* for the father.

*Ann Ponichtera DeNardis,* for the mother, submitted a brief.

BROWN, J. D.A. (father) appeals from a contempt judgment entered by a judge of the Probate and Family Court, as amended and supplemented, and an order denying his motion for relief from the judgment on which the contempt was brought. These

actions, which were heard together by the panel, all have their genesis in the father's failure to return the parties' child to M.M. (mother) after the child was taken to Costa Rica by the father in 2006. We affirm the judgment, as supplemented, and the order.

1. *Background and proceedings.* a. *General background.* The parties were never married. In 2000 they moved from Massachusetts to Costa Rica where members of the father's family control an Internet gambling company, and where the father has lived "off and on" since he was seventeen years old.[1] The parties returned to the United States in 2001, and the child was born in Massachusetts on July 27, 2003. A voluntary acknowledgment of parentage was executed by the parties that same month.

Between 2001 and 2004 the parties had a "rocky relationship" and were together off and on until the father moved back to Costa Rica in January, 2004. Subsequent to the father's move, the mother spoke with the father five to seven times per week at his place of employment in Costa Rica.

In June, 2004, the child was removed from the mother's custody by the Department of Children and Families (DCF) and placed in the care of the father's mother for approximately one year. Upon the child's removal from the mother, the father returned from Costa Rica once a month for one week at a time and stayed with his mother at her home on Chavenson Street in Fall River. Throughout the period when she had custody of the child, the father's mother spoke to the father almost daily regarding the well-being of the child.[2]

In May, 2005, the child was returned to the mother's care, and in December of that year, the mother took the child to Costa Rica to visit the father. The mother and child stayed at the

---

[1]When the father lived in Costa Rica he stayed with his brother and worked at the gambling company with his brother and cousin.

[2]There were other developments in the father's life in 2004 and 2005. In 2004, the father was served with a complaint to establish paternity of another child (by a different woman) at his mother's residence on Chavenson Street. The father's mother gave the paperwork to the father in Massachusetts in September, 2004. In January, 2005, approximately "one year after he had purportedly moved to Costa Rica," the father signed an acknowledgment of paternity for the other child and used the Chavenson Street address as his address.

father's brother's house; the mother did not know the father's address in Costa Rica.

In August, 2006, the mother, who was then unemployed and experiencing financial difficulties, became "reinvolved" with DCF. Following a conversation between the parties about the father taking the child to Costa Rica for a few weeks while the mother "got back on her feet," the mother agreed to allow the father to take the child and obtained a notarized letter giving him permission to remove the child out of the country. The mother and child met the father in Florida in late August, 2006. At the mother's insistence, the father signed a document stating that he would return the child to the mother in the United States on or before September 10, 2006.

On September 19, 2006, the mother, who had been in daily contact with the father and child in Costa Rica, asked the father when he would be sending the child home. The father responded that he had "tricked her" and that he would not be returning the child.

On September 21, 2006, the mother filed a complaint for support and custody pursuant to G. L. c. 209C that indicated that the father lived in Costa Rica. She directed the sheriff to serve the father at his last known address at Chavenson Street in Fall River.[3] A temporary order was also issued on September 21 awarding the mother sole legal and physical custody of the child, directing the father to return the child to the mother forthwith, and assigning the matter for review on October 6, 2006. The mother notified the father about her filing of the complaint and the issuance of the temporary order giving her custody of the child, and told him of the October, 2006, court date. In addition, the mother told the father that she sent the papers to his mother's home on Chavenson Street in Fall River.

No further orders were entered on October 6, 2006, and no other orders were entered in the case until 2008. Between 2006 and 2008, the mother worked with Federal, State, and local

---

[3]The return of service, filed on October 6, 2006, was signed by the deputy sheriff and recites that on September 26, 2006, copies of the summons and complaint were left at the father's "last and usual place of abode" at the Chavenson Street address and mailed by first class mail to the above address as well as to a certain post office box in Fall River.

authorities to secure the return of the child. The mother has not seen the child since 2006.

In July, 2008, the father was arrested in Costa Rica and was extradited to the United States to face criminal charges arising from his conduct. On August 8, 2008, a Massachusetts attorney entered a special appearance on behalf of the father in connection with the mother's complaint for custody. Counsel indicated that the "Special Appearance [did] not waive the [Defendant's] right to challenge the jurisdiction of the court [or] the improper service of process."[4] No further pleadings were filed by the father's attorney.

In late September and early October, 2008, the mother returned to the Probate and Family Court to obtain a permanent custody order. On October 8, 2008, a judgment was entered granting the mother sole legal and physical custody of the child (noting that such an order was in the child's best interests) and stating that the father was under a continuing obligation to return the child to the mother forthwith.[5]

In November, 2008, the father's brother and his common-law wife obtained guardianship of the child through a Costa Rican court.

b. *The contempt action.* On April 6, 2009, the mother filed a complaint for contempt (twice amended) alleging that the father had violated the judgment of October 8, 2008, by failing to return the child to her and by failing to observe her right to sole legal and physical custody of the child.[6] At some point during the first day of trial the father's counsel moved orally to dismiss the contempt action. The motion to dismiss, grounded in the alleged insufficient service of process of the mother's underlying

---

[4] The judge stated that there was no indication on the docket or in the Probate and Family Court file that the special appearance was served on the mother.

[5] On or about October 8, 2008, the father's mother also filed a petition seeking guardianship of the child. The father assented to his mother's proceeding for temporary or permanent guardianship of the child.

[6] The contempt, together with the father's mother's petition for guardianship of the child, were heard over a four-day period between April 14, 2009, and May 27, 2009. (The father also filed an emergency motion to continue hearing on April 14.) The father declined to testify on substantive issues at the trial, citing his rights under the Fifth Amendment to the United States Constitution. We have been provided with only excerpts of the trial transcripts.

complaint for custody, was heard on May 20, 2009, and taken under advisement.

By a judgment dated September 24, 2009, the father was adjudged guilty of contempt for failing or refusing to comply with the judgment dated October 8, 2008, and its prior temporary order of September 21, 2006.[7] The judge ordered the father to arrange to have the child returned to the United States forthwith and returned to the mother's custody by November 1, 2009. Recognizing, however, that the involvement of the Costa Rican court through the father's brother's guardianship proceeding had made "return of the child more complex,"[8] the judge found that an alternative remedy was necessary. The judge ordered that should the father fail or be unwilling to produce the child in the United States, he would have to pay $40,000 to the mother by December 1, 2009, as a "coercive sanction" so that she could prosecute an action in Costa Rica to seek return of the child to the United States. The judge found that the father "clearly ha[d] the ability to pay this sum, as evidenced by the undisputed fact that he has posted bail set at $400,000 in the criminal case." The matter was assigned for compliance review on December 17, 2009, the judge reserving for that hearing "consideration of entry of a jail sentence on the civil contempt." Return of the child or

---

[7]The judge denied the father's motion to dismiss the contempt action, stating that the father "did not timely raise his defense of insufficient service of process." More specifically, the judge, after noting that the father brought the motion to dismiss on the first day of trial, stated: "Previous to this, the Father's prior counsel never served the special appearance, never filed an answer to the complaint asserting insufficient service of process or a motion to dismiss; his new counsel filed a motion to continue. Under Rule 12(h)(1) of the Massachusetts Rules of Domestic Relations Procedure, the defense of insufficient service of process is waived if not made by motion or included in the first responsive pleading. Mass.R.Dom.Rel.P. 12(h)(1). By filing the motion to continue, the Father's counsel entered a general appearance that did not assert the defense of insufficient service of process. Therefore, the Father has waived this defense." Continuing, the judge stated that "[b]ased on the fact that the Court has denied Father's assertion of insufficient service of process, and that he had actual notice, the Court finds the Father to be in contempt of the October 2008 judgment."

The judge declined to act on the father's mother's petition for guardianship until the child was returned to the United States.

[8]The judge stated: "[T]he Court does not find that the Father is unable to influence his brother on the issue of returning the child."

payment of the $40,000 would be deemed sufficient to purge the contempt.[9] The father has appealed from the judgment of contempt.

c. *The supplemental judgment.* By order dated December 15, 2009, on the father's motion to stay the contempt judgment, a single justice of this court determined that while "coercive damages do not apply where the record is, at best, unclear in establishing the [father's] ability to comply, these circumstances allow an award of compensatory damages to the [mother] allowing her to pursue the result that ought to have followed from compliance by the [father], in the event that he does not or cannot remedy his failure to comply." Continuing, the single justice stated, "In that event, the specific amount of the compensatory award should be determined through findings of the actual costs incurred or reasonably estimated in advance, ultimately supported by a precise accounting from the [mother]." The stay was denied, conditional upon the recasting of the judge's order as specified by the single justice.

In accordance with the order of the single justice, a hearing was held and a supplemental judgment dated January 19, 2010, was issued amending and supplementing the contempt judgment. The probate judge ordered, inter alia, that should the father fail or be unwilling to produce the child in the United States, he would pay the mother the sum of $55,000 as compensatory damages to allow her to pursue the result that ought to have followed from compliance by the father. The mother was also awarded counsel fees on the contempt in the amount of $30,000 and attorney's fees pendente lite in the amount of $5,000 for the defense of the appeal. The judge ordered the father committed to jail for ninety days or until he partially purged himself of the contempt by payment of $40,000 (of which $23,000 was to be credited towards the compensatory damages and $17,000 towards the attorney's fees awarded for the prosecution of the

[9]The judge also ordered that the bail posted by the father in the criminal proceedings in the District Court was not to be returned pending order of the Probate and Family Court. Specifically, he ordered: "If the District Court proceedings terminate before the review date of this proceeding, the cash portion of the bail shall be turned over to the Register of Probate to secure Father's continued participation in this action and compliance with this judgment."

contempt and the defense of the appeal)[10] or until further order of the judge or until the father was otherwise discharged by due course of law. If the father had not purged himself by the end of the ninety-day sentence, he was to be brought before the judge for "re-sentencing." The remainder of the terms of the contempt judgment were to remain in effect. It appears that the father was taken immediately into custody. The father has appealed.[11]

d. *The motion for relief from judgment.* On September 29, 2009, the father filed a motion for relief from judgment pursuant to Mass.R.Dom.Rel.P. 60(b)(4) seeking relief from the judgment that was entered on October 8, 2008, on the mother's complaint for custody and support. As grounds, the father stated that the judgment was void as the mother had failed to effectuate proper service upon him. The same judge who entered the judgment of October 8, 2008, denied the motion, stating that "the question of proper service was raised and litigated in full at the time of trial on mother's complaint for contempt, and extensive findings on the question of service were included in the . . . judgment" entered September 24, 2009. The judge "decline[d] to permit re-litigation of this issue." The father has appealed from the order denying his motion.

e. *Subsequent proceedings.* On April 16, 2010, a single justice of this court entered a memorandum and order on the father's motion for a stay in which he sought to challenge his continued incarceration for civil contempt. The single justice stated that the father was initially able to post $400,000 cash bail with the assistance of his stepmother, but the stepmother had revoked that payment. Continuing, the single justice stated:

"Given that it has been established that the step mother

---

[10]In the memorandum of decision on supplemental judgment, the judge stated that he would not restate all the findings and rationale of September 24, 2009, including the findings on the father's ability to pay. The judge noted that the father continued to have two different, privately retained attorneys in the domestic and criminal cases.

[11]The father's motion to stay the supplemental judgment was denied after hearing on March 16, 2010, the judge stating that regardless of the source of the funds, the father has been free on $400,000 cash bail in the criminal proceedings and continued to be represented by two different attorneys in the courts of the Commonwealth. We note that in his brief on the appeal from the supplemental judgment, the father acknowledges that he makes reference to certain material in his record appendix that was not presented to the judge below.

revoked the money she provided for bail, from all that appears in the record, the defendant would remain incarcerated regardless of what happens with the civil contempt. Moreover, the supplemental judgment states that the defendant will be brought back to court for review and 're-sentencing' after ninety days (a date that is quite imminent). At that hearing, the [judge] will have an opportunity to address the defendant's present ability to purge his contempt."

In the light of these considerations, the single justice denied the father's motion for a stay without prejudice to his renewal of the motion after the upcoming lower court hearing.

After the review and resentencing hearing in the Probate and Family Court the judge indicated in his "further order and memorandum of decision on complaint for contempt" (dated June 1, 2010) that he was advised through the order of the single justice that the father's stepmother had withdrawn the $400,000 cash bail, resulting in the father being held in pretrial detention in the criminal proceedings pending against him. Counsel for the parties concurred with the judge at the hearing "that a further sentencing on the contempt at this point in time was an academic exercise since the defendant is already in jail." Counsel orally agreed that no further sentence was to be issued by the judge on the civil contempt at that time and that the matter was to be brought before the Probate and Family Court judge for hearing prior to the father's release from custody for any reason.[12] The judge directed the register to transmit a copy of its further order on the complaint for contempt to this court as a part of the previously assembled record, so that it would be available to the court during its consideration of the case. Cf. *Braun* v. *Braun*, 68 Mass. App. Ct. 846, 853-854 (2007).

2. *Discussion.* a. *The contempt judgment, as supplemented.* "[I]n order to find a defendant in civil contempt there must be a

---

[12]After discussing the Supreme Judicial Court's recent decision in *Birchall, petitioner*, 454 Mass. 837 (2009), the judge also stated that if the criminal proceedings had ended, there might be no basis for the father to decline to testify at a future hearing under a claim pursuant to the Fifth Amendment. The judge noted that that would allow for a fuller inquiry of the father on the actions he had taken to facilitate the return of the child, or lack thereof. The judge also indicated that the next hearing could be influenced by the outcome of the criminal matter.

clear and unequivocal command and an equally clear and un-doubted disobedience." *Larson* v. *Larson*, 28 Mass. App. Ct. 338, 340 (1990). *Poras* v. *Pauling*, 70 Mass. App. Ct. 535, 539-540 (2007). The father raises several challenges to the judge's adjudication of contempt.

(i) *Service, notice and waiver.* The father argues that the judge "committed clear error in its finding that there was proper service of the underlying complaint" for custody and support. More specifically, the father, relying in large part on the mother's testimony that she knew, for example, that the father was not living in Fall River at the time of service and was in fact resid-ing and working in Costa Rica, asserts that the record does not support a finding that service upon him at the Chavenson Street address was at his "last and usual place of abode" (see Mass. R.Dom.Rel.P. 4) or his "home" at the time of service. The father argues that because he was not properly served with the complaint for custody and support, the mother cannot establish that his disobedience of same was clear and undoubted.

At the outset, and as we note throughout this opinion, the father's argument suffers from serious deficiencies in that he has failed to provide this court with complete transcripts of the trial testimony (including the testimony of the mother). It simply can-not be gleaned on this record whether there was other evidence at the trial which sheds light on the question of service. That aside, the judge made no specific finding that the father was properly served at the Chavenson Street address. Rather, as we have discussed, the judge determined that the question of insuf-ficient service of process was not timely raised and was thus waived.

The father also claims that he "never received notice of the September 2006 temporary order or the October 2008 judgment and as such, he cannot be bound by the terms therein." The judge found, however, that the father had actual notice both of the temporary order and the fact that a judgment had issued in the matter. Cf. *United Student Aid Funds, Inc.* v. *Espinosa*, 130 S. Ct. 1367 (2010). In any event, it has not been made to appear on the truncated record before us that the judge's findings are erroneous.

The father makes the additional argument that the judge erred

in determining that he had waived the defense of insufficient service of process.[13] The father suggests that the judge's analysis under Mass.R.Dom.Rel.P. 12(h)(1) is incorrect in that rule 12 would appear only to have application to the mother's complaint for contempt, the service of which he does not contest. The father states that the real "crux" of his defense was that he could not comply with the judgment underlying the contempt as he never received notice of same. In the absence of a complete transcript (resulting in our inability to determine, for example, whether there were statements made at the proceedings that may have had an impact upon the question presented, or how the parties would proceed at the contempt hearing),[14] we are not inclined to disturb the contempt judgment.[15] Furthermore, and as a practical matter, to the extent the father asserts that he had no notice of the judgment on the mother's complaint for custody, the judge, as we have stated, found otherwise.[16]

(ii) *Inability to comply.* The father argues that he should not have been adjudged in contempt and incarcerated as he does not have the ability to comply with any of the judge's orders.[17] A person who is adjudged in civil contempt may not be sentenced to prison for failure to pay a compensatory sum of money if he shows that he is unable to comply; such a result would constitute a denial of due process. See *Sodones* v. *Sodones*, 366 Mass.

---

[13]We note in passing that the father has failed to address directly (or at least in any meaningful way) the judge's findings concerning the father's failure to raise at any juncture specified by the judge the defense of insufficient service of process.

[14]Among other things, the judge found, as we have noted, that the father's counsel first brought the motion to dismiss on the first day of trial. It cannot be gleaned on the record before us what was said with respect thereto. The father moved again to dismiss the contempt action prior to cross-examination of the mother. Only one-half page of the transcript of the argument is included in the supplemental record appendix. The father's motion to dismiss at the close of the plaintiff's case appears to make some reference to the earlier argument.

[15]As the father's counsel acknowledged at oral argument, and we agree, there is a paucity of case law relative to the father's argument with respect to rule 12(h)(1).

[16]We discern nothing in the father's argument that the judge failed to make specific findings pursuant to G. L. c. 215, § 34B, that would cause us to disturb the judgment.

[17]The father requests in his briefs in two of his appeals that he be released from custody.

121, 130-131 (1974); *Salvesen* v. *Salvesen*, 370 Mass. 608, 611 (1976). See also *O'Connell* v. *Greenwood*, 59 Mass. App. Ct. 147, 154 (2003).

The father asserts initially that because the child is presently within the guardianship of his brother and his brother's wife in Costa Rica, he is unable to arrange for the return of the child to the United States. While acknowledging that the judge specifically did *not* find that the father is unable to influence his brother, the father states that there was no evidence presented at the trial to support this finding. It is enough to say that the father, by failing to provide this court with complete transcripts, is not in a position to argue that the judge's finding is unsupported. See *Connolly* v. *Connolly*, 400 Mass. 1002, 1003 (1987). It is also clear that the judge envisioned that the return of the child might be made more complex by the Costa Rican guardianship proceeding and, consequently, found it necessary to establish an alternative remedy.

The father claims that there was "no evidence [at the contempt trial] to support that [he] has the ability to pay a coercive sanction or compensatory damages," and no evidence in the contempt proceedings to support the judge's finding that it is an "undisputed fact" that he had posted $400,000 bail in the criminal proceeding. On the specific arguments made (putting to one side the fact that it was the father's burden, as he acknowledges, to show an inability to pay), the father, again, is not in a position to demonstrate error on the limited record before us.[18]

Finally, the father asserts in his appeal from the supplemental judgment that his due process rights were violated when the judge entered the supplemental judgment and ordered that he be immediately incarcerated without providing him with "a meaningful opportunity to pay the amount ordered, or in the alternative, an opportunity to be heard as to his ability to pay the amount set by the [judge]." Notwithstanding the father's contention that the contempt action alleged violation of an order of custody with no financial component (and that he would not have appropriately

---

[18]At a minimum the judge's findings suggest that the father then had access to substantial funds. In subsequent proceedings it appears that a showing was made that the father's stepmother had provided the money to post bail but had later revoked the bail.

raised the issue of ability to pay at the contempt trial or before entry of the judgment on the mother's complaint for contempt), the judge did, in fact, make findings in the contempt action that the father had the ability to pay the sum of $40,000. (Again, we do not have the complete transcripts before us.) The judge also made reference in his memorandum of decision on the supplemental judgment to his findings in the contempt action concerning the father's ability to pay and noted that the father continues to have two different privately retained attorneys in the domestic and criminal cases. From all that appears, the issue of the father's ability to pay was considered and addressed by the judge. To the extent the father argues again that there is no evidence in the record to support the judge's findings in the contempt action concerning his ability to pay, his argument fails for the reasons we have previously discussed.

A final comment is in order. Apart from the deficiencies in the record appendices, it appears that subsequent events may have overtaken certain of the father's arguments and requests. As the father is in jail pending trial in the criminal proceedings, no further sentence has been issued by the Probate and Family Court judge on the civil contempt. As we have stated, if the father is to be released from custody for any reason, the parties agreed that he is to be brought before the Probate and Family Court judge for a new hearing. As the judge noted in his further order and memorandum of decision dated June 1, 2010, the "posture of this case" has changed since it was last before the judge.

b. *The motion for relief from judgment.* "A judgment is void if the court from which it issues lacked jurisdiction over the parties, lacked jurisdiction over the subject matter, or failed to provide due process of law." *Harris* v. *Sannella,* 400 Mass. 392, 395 (1987). See *Colley* v. *Benson, Young & Downs Ins. Agency, Inc.,* 42 Mass. App. Ct. 527, 532 (1997). Here, the father argues that the judge erred in denying his motion pursuant to Mass.R.Dom.Rel.P. 60(b)(4) "as it is clear that the judgment [of October 8, 2008, was] void for lack of service" and he was thus deprived of due process of law. The father, pointing to certain evidence adduced at the contempt hearing (including, in substantial part, testimony of the mother), asserts that it cannot be established that the judgment is valid as the record does not

support a finding that service upon him at the Chavenson Street address was appropriate.

This argument fails for substantially the reasons we have previously discussed. Not only are there deficiencies in the record appendix, the father fails even to address in his brief on the appeal of the denial of his rule 60(b) motion the judge's determination that he had waived the defense of insufficiency of service of process. See *Colley* v. *Benson, Young & Downs Ins. Agency, Inc.*, 42 Mass. App. Ct. at 529. Moreover, there is nothing in the father's argument that persuades us that the judge erred in declining to permit relitigation of the issue.

3. *Conclusion.* The judgment dated September 24, 2009, as supplemented on January 19, 2010, and the order dated October 9, 2009, denying the motion for relief from judgment, are affirmed.

*So ordered.*